# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 13, 2013

## STATE OF TENNESSEE v. WILLIE GATEWOOD

**Direct Appeal from the Criminal Court for Shelby County**
**No. 10-05288     Chris Craft, Judge**

---

**No. W2012-02563-CCA-R3-CD  - Filed November 21, 2013**

---

A Shelby County jury convicted the Defendant, Willie Gatewood, of attempt to commit first degree premeditated murder and aggravated burglary. The trial court sentenced the Defendant to fifty-five years for the attempt to commit first degree premeditated murder conviction and to thirteen years for the aggravated burglary conviction. The trial court ordered the sentences to be served consecutively in the Tennessee Department of Correction. On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions. After a thorough review of the record and applicable authorities, we discern no error in the judgments of the trial court. Accordingly, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Tony N. Brayton (on appeal) and R. Trent Hall (at trial), Memphis, Tennessee, for the appellant, Willie Gatewood.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Senior Counsel; Amy P. Weirich, District Attorney General; Christopher J. Lareau and Christopher L. West, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant's unlawful entry into the victim's home and subsequent shooting of the victim in the arm and chest. A Shelby County grand jury indicted the Defendant for attempt to commit first degree premeditated murder and aggravated

burglary.

At the Defendant's trial, the parties presented the following evidence: The victim testified that on February 24, 2010, he returned home from lunch around 1:15 p.m. to find an unfamiliar car parked in his driveway. The car, a burgundy Chevrolet Envoy with a black top, was backed up to the garage door of his house, with the driver's side door open and the motor running. The victim recalled that he first walked around to the back of his house to look for the driver of the vehicle in the backyard. After walking all the way around the house, the victim stated that he noticed his front door was "pushed in" and that a piece of wood from the door was lying on the ground. He said at this point he realized someone was in his house. He clarified that the front door of his house was not standing wide open but was open enough so that he could see it had been damaged.

The victim testified that he went to the unfamiliar car parked in his driveway and turned off the motor. He took the keys out of the car, as well as a pair of glasses and a cellular phone that were lying in the front passenger seat. When the victim stood up from the car, he saw a person coming out of his house carrying a "satchel." The victim asked him, "What are you doing in my house?" The victim identified the Defendant as the man he had seen exiting his house. He stated that he had never seen the Defendant before and that the Defendant did not have his permission to enter the house. The victim stated that the Defendant responded to the victim saying he was "[f]ixing something." The victim responded, "You ain't fixing something at my house." The victim testified that at this point, the Defendant pulled out a gun and said, "Give me them keys or I'm going to shoot you." The victim testified that the Defendant pulled the gun from his pocket and started walking toward him while waving the gun and threatening, "I'm going to shoot you." The victim said he threw his arms up and yelled, "Help," twice, and then the Defendant shot him "through [his] arm and hit [his] chest." He described the motion of throwing his arm up like, "blocking a throw or pitch[.]" The victim described an immediate burning sensation to his arm and the feeling of paralysis as the victim fell to the ground. As he was lying on the ground, he heard the sound of the Defendant's car start and drive away.

The victim testified that he got up from the ground after the Defendant left and started trying to call people for help. He stated that he still had the cellular phone that he had taken from the Defendant's vehicle. The victim said he held his arm tightly in an effort to stop the bleeding, and he used his own phone to call his son, his daughter, and a "FedEx lady" for help. The FedEx lady called the police for him, and the victim walked up to the front steps of his house and sat down on the porch. He said he put the cellular phone from the Defendant's car on the porch, and when the sheriff's deputies arrived, he pointed them to the cellular phone and indicated it had come from the Defendant's car. The cellular phone was introduced into evidence and marked as an exhibit. When the ambulance arrived, the

technicians put two IV's in his arm and took his shirt off. The victim stated that the bullet from the Defendant's gun went through his arm and into his chest. The bullet fell out of the victim's shirt, and he carried it in his hand while the ambulance transported him to the hospital. The victim stated he did not go inside his house until he returned home from the hospital at 11:30 p.m. that night.

The victim testified that when he returned home that night, he discovered that his wife's "ring tree" that had been on the dresser in the master bedroom was missing, along with the rings that were on it.

The victim testified that he spoke to sheriff's deputies at the hospital, and they asked him to look at a photographic lineup to attempt to identify the man who burglarized his house. The victim said he made an identification, placed his signature at the bottom of the lineup, and wrote the word "maybe" underneath. He stated that the reason he wrote "maybe" was because he did not remember the shooter's hair being as long as it was in the photograph he identified. Sheriff's deputies asked the victim to look at a second photographic lineup, and the victim identified a different photograph of the same person. He stated he was more sure of this photograph, because it was "more closely to what [the Defendant] looked like" at the time of the burglary. The victim testified that he had identified the Defendant in the preliminary hearing as the man who shot him.

On cross-examination, the victim stated that he stayed at the hospital for six hours on the day he was shot and that before he got home that night, his son and friends had cleaned up the mess in his house and fixed his front door. He agreed that he had $4,000 cash in his home that was not stolen.

The victim testified that, because he is a youth Sunday School teacher, he has a lot of youths hanging around his house and that it was not unusual for him to come home and find a car in the driveway. He stated that, for that reason, he did not think it unusual when he saw the Defendant's car in his driveway, although he did find it unusual that the engine was running.

The victim reiterated that his uncertainty related to the identification in the first photographic lineup was due to the Defendant's hair and that the victim "didn't realize [the Defendant's] hair was that long[.]" He explained that the Defendant's hair "appeared to be shorter whenever he was coming out of [the victim's] house."

Susan Roberts, the victim's wife, testified that on the day of these crimes, no one but her and her husband had permission to be in their home. She testified that, after spending the evening at the hospital with the victim, she returned home and found that her crystal ring

tree was missing, along with a diamond ring, her wedding band, her engagement ring, and about seven other rings.

Toby Stone testified that he encountered a burgundy SUV parked in the middle of the road near the victim's house, with an African American man standing near the back of the vehicle with the hatch open. He stated he did not get a good look at the man's face.

On cross-examination, Mr. Stone agreed that, after learning the victim had been shot, he told police about the man and the vehicle parked in the middle of the road. He gave the police a description of the vehicle and told them that the man had "dreads" woven on his head.

Brian Bowman testified that he was the manager of Pyramid Used Cars in Memphis, Tennessee, and that he had received a credit application from the Defendant listing the Defendant's cellular phone number. He stated that he sold to the Defendant a 2002 GMC burgundy Envoy, and that the car was registered in the Defendant's name.

Deputy Larry Emery testified that on February 24, 2010, he responded to a call about a burglary and shooting and was the first one to arrive at the scene. When he arrived at the victim's house, he found the victim sitting on the front porch, bleeding. He stated that there was blood all over the porch, the walkway, and in the yard. The victim told him that someone had "burglarized" his house and that when the victim tried to stop the burglar, the burglar shot the victim.

Deputy Emery testified that he requested medical help and detectives for further investigation and secured the scene. He stated that he saw a cellular phone on the porch that he later was told did not belong to the victim. Deputy Emery testified that when he arrived at the scene, the victim's arm appeared to be bleeding and that he appeared to have gunshot holes or wounds in his arm and chest.

Detective Jason Valentine testified that he showed the victim a photographic lineup at the hospital and that the victim identified one photograph and wrote under it, "May be the guy, this could possibly be the guy . . . that shot me." Detective Valentine testified that the victim was not one hundred percent certain that the photograph he had identified was the man who shot him but that "he felt pretty certain" his identification was correct. Detective Valentine stated that he showed the victim a second photographic lineup and that the victim made a "[o]ne hundred percent" identification of one photograph and said, "This is the person." Detective Valentine testified that the two photographs the victim had identified were the same person and that person was the Defendant.

Steve Bierbrodt testified that he was working for the sheriff's office at the time of the crime and that he responded to the scene due to the other deputies finding a cellular phone, that was previously identified by the victim as the one taken from the Defendant's car. Mr. Bierbrodt was able to identify the cellular phone by its serial number, as well as the phone number associated with the phone. Mr. Bierbrodt stated that he ran the phone number through the police department's public records system and that the Motor Vehicle Registration database indicated that the phone number was registered with the Defendant's vehicle.

The Defendant testified that "a guy that hired [the Defendant] to bring him to finish doing a job site" was the person responsible for shooting the victim. The Defendant stated that he did not know the shooter's real name but knew him by his street name, "Big Daddy." The Defendant said he was at the victim's home on the day of the shooting with "Big Daddy," waiting for him to "drill a few holes and run a few wires." The Defendant explained that this was why his cellular phone and sunglasses were found at the crime scene. The Defendant stated that he did not enter the victim's home but that he was present when "Big Daddy" shot the victim. The Defendant and "Big Daddy" left the scene together, and then the Defendant dropped "Big Daddy" off in his neighborhood. The Defendant stated he did not call the police about the shooting because he was "just glad to get back away from the situation and [halfway] safe." The Defendant agreed that he had prior convictions for attempting to introduce contraband into a penal facility and robbery.

On cross-examination, the Defendant testified that he picked "Big Daddy" up at a store, under the auspices that the Defendant was going to do some work for him at a house. He stated that they drove in the Defendant's car to the house and that the Defendant backed his car into the driveway. The Defendant said that he stayed in the car while "Big Daddy" did some drilling, and that, at some point, the Defendant walked around to the back of the house. When the Defendant heard another vehicle pull up out front, he went to the side of the house and heard a confrontation ensue in the front yard. The Defendant said he then came around the corner of the house and saw the victim and "Big Daddy" in the front yard. He stated that the victim asked him what he was doing at the house, and the Defendant responded, "I'm just helping someone with some work." The Defendant said that upon realizing that "something was wrong," he returned to his vehicle and found that his keys were not in the vehicle where he left them. The Defendant asked "Big Daddy" where his keys were, and "Big Daddy" responded that he did not have them and asked the victim about the keys. The Defendant said at that point, "Big Daddy" went into his pocket and pulled out a gun, waved the gun at the victim and said, "Give me the keys." The Defendant said the victim responded, "I'm not going to give you the keys, and then the Defendant heard a "pop." The Defendant stated that "Big Daddy" took the car keys from the victim and drove away in the Defendant's car, with the Defendant in the passenger seat.

The Defendant stated that the day after the incident, he asked his sister to sell his vehicle to the dealership, because the truck had been on the news and he "knew the police were looking for [him]." He stated he was "momentarily" avoiding the police.

On rebuttal, the victim testified that after he arrived home on the day of the incident, saw the vehicle in his driveway, and took the keys out, he saw the Defendant coming out of his house and down the front steps of his porch. He stated the Defendant was the only person there besides himself. He maintained that the only person he saw that day was the Defendant and that it was the Defendant who shot him.

On surrebuttal, the Defendant testified that he was "lured" to the victim's house under the false pretenses of installing some wires for a satellite television.

Based upon this evidence, the jury convicted the Defendant of criminal attempt to commit first degree murder and aggravated burglary. The trial court found that the Defendant was a persistent Range III offender and imposed a fifty-five year sentence for the criminal attempt to commit first degree murder conviction and a consecutive thirteen-year sentence for aggravated burglary. It is from these judgments that the Defendant now appeals.

## II. Analysis

The Defendant contends that the evidence is insufficient to sustain his convictions because the State did not prove that the Defendant "acted with the intent to commit" premeditated first degree murder and that the State did not establish the element of premeditation. The Defendant contends that the evidence presented showed that he threatened to "shoot" the victim, not kill the victim, and that the proof only shows that the Defendant intended to rob the victim and "be long gone before the victim returned." The State responds that the victim's testimony established that the Defendant committed these crimes and that the Defendant's "entire course of action is corroborative of the intent to commit the offense." We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence.

*Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### A. Criminal Attempt to Commit First Degree Murder Conviction

The Defendant contends that there is insufficient evidence to prove beyond a reasonable doubt all of the elements required for a criminal attempt to commit first degree murder conviction. He argues that the evidence presented does not prove the element of premeditation and does not justify a guilty verdict.

First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2010). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2010). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d) (2010).

The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

For attempt of this offense, Tennessee law states the following:
(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the

person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

> (b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

> (c) It is no defense to prosecution for criminal attempt that the offense attempted was actually committed.

T.C.A. § 39-12-101 (2010).

The evidence, viewed in the light most favorable to the State, shows that the Defendant, armed with a handgun, forcibly entered the victim's house without permission. The Defendant was in possession of the weapon when he encountered the victim in the victim's front yard as the Defendant was exiting the victim's house with a satchel. The victim was standing between the Defendant and the Defendant's vehicle. The Defendant walked toward the victim and threatened to shoot him if the victim did not return his keys. The Defendant removed the gun from his pocket and fired a shot directly at the victim, hitting him in the arm and the chest. The Defendant immediately fled the scene, leaving the victim bleeding in his front yard.

We conclude that this evidence is sufficient to establish that the Defendant attempted to kill the victim, by shooting him, so that the Defendant could leave the scene of the burglary. The factors indicating premeditation were present throughout the crime, including the Defendant's possession and use of a deadly weapon upon the unarmed victim during the commission of the burglary, the declaration by the Defendant of his intent to use the weapon, as well as the Defendant's calmness after the crime as he picked up the keys and drove away. These factors establish sufficient evidence for the jury to infer that the Defendant intended to kill the victim and that the Defendant acted after exercising reflection and judgment. Therefore, the requisite elements of premeditation were established by the evidence presented to the jury. The Defendant is not entitled to relief on this issue.

### B. Aggravated Burglary Conviction

The Defendant contends that there is no "direct evidence" that he ever entered the victim's home and that the State did not meets its burden of proof beyond a reasonable doubt.

To convict the Defendant of aggravated burglary the State must show that he intentionally, knowingly, or recklessly entered a habitation without the effective consent of

the owner, with the intent to commit a felony, theft, or assault. *See* Tenn. Code. Ann. §§ 39-14-402, 39-14-403, 39-14-401(1)(A), (3) (2010).

The evidence, viewed in the light most favorable to the State, shows that the victim arrived home and saw that his front door had been "busted" open. He then saw the Defendant exiting his home. The victim testified that he did not know the Defendant and that he had not given his permission for the Defendant to enter his home. When the victim confronted the Defendant about his presence in the victim's home, the Defendant threatened to shoot the victim if the victim did not return the Defendant's car keys. The victim and his wife both testified that jewelry was missing from the master bedroom after the victim found the Defendant in their home. This evidence supports the jury's conclusion that the Defendant, armed with a weapon, intentionally entered the victim's house, without the consent of the victim, to commit a theft.

Accordingly, we conclude that there was sufficient evidence to support the jury's finding of guilt beyond a reasonable doubt as to the Defendant's aggravated burglary conviction. The Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the record and aforementioned authorities, we conclude that the evidence is sufficient to sustain the Defendant's convictions. We, therefore, affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE